## In the United States District Court
### for the Southern District of Ohio
### Western Division at Cincinnati

| | |
|---|---|
| Paul Mullins, | |
| *On behalf of himself and those similarly situated*, | Case No. 1:17-cv-426 |
| Plaintiff, | Judge |
| v. | Magistrate Judge |
| Southern Ohio Pizza, Inc. d/b/a Domino's Pizza, Domino's Pizza, Inc., Domino's Pizza, LLC, Domino's Pizza Franchising, LLC, Louis Metro, and Karen Metro, | Jury Demand Endorsed Hereon |
| Defendants. | |

## Class and Collective Action Complaint

1. Paul Mullins, on behalf of himself and all similarly-situated individuals, brings this action against Defendants Southern Ohio Pizza, Inc. ("SOP"), Domino's Pizza, Inc., Domino's Pizza, LLC, and Domino's Pizza Franchising, LLC (collectively "Domino's"), Louis Metro, and Karen Metro. Plaintiff seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiff and similarly-situated individuals with minimum and overtime wages as required by the Fair Labor Standards Act ("FLSA"), the Ohio Constitution, Article II, Section 34a ("Section 34a"), O.R.C. § 4113.15 (Ohio's "Prompt Pay Act"), and O.R.C. § 2307.60.

2.    According to its 2016 Annual Report, Domino's is the second largest pizza company in the world, and the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

3.    In 2016, Domino's restaurants grossed $10,000,000,000.00 on delivery sales.

4.    In 2016, ninety-three percent (4,979 out of 5,371) of Domino's restaurants nationwide were owned by franchisees.

5.    SOP is one of Domino's' franchisees.

6.    SOP, owned and operated by Louis and Karen Metro, runs approximately nineteen Domino's franchise stores in the Cincinnati, Ohio area (the "Cincinnati Regional Stores").

7.    Plaintiff and his similarly situated delivery drivers at franchise stores such as the Cincinnati Regional Stores are the lynchpin of Domino's' entire organization.  Their work is essential to Domino's' cause.

8.    Domino's, SOP, Louis Metro, and Karen Metro jointly employ Plaintiff and similarly-situated delivery drivers at all times relevant.

9.    At all relevant times, Defendants shared or co-determined those matters governing the essential terms and conditions of employment for Plaintiff and similarly situated delivery drivers.

10.    At all relevant times, all Defendants had direct or indirect control over the terms and conditions of Plaintiff's work and the work of similarly situated delivery drivers.

11.     At all relevant times, all Defendants possessed the authority to control the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers, and have exercised that authority.

12.     Together, Defendants repeatedly violated the Fair Labor Standards Act, the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act, by improperly taking a tip credit from their wage and by failing to adequately reimburse delivery drivers for their delivery expenses, and thereby failing to pay delivery drivers the legally mandated minimum wage for all hours worked, and minimum overtime rate for hours worked in excess of 40 per workweek.

13.     Defendants maintain a policy and practice of underpaying their delivery drivers in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Ohio Constitution, Art. II, § 34a ("Section 34a"), and the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.01, *et seq.* (the "OMFWSA"), and O.R.C. § 4113.15.

14.     Until May of 2017, Defendants maintained a policy and practice of paying their delivery drivers minimum wage minus a tip credit for all hours worked, including hours worked inside the restaurant.

15.     Defendants maintain a policy and practice of failing to reimburse delivery drivers for costs and expenses essential to their employment, including but not limited to automobile costs, gasoline, insurance, automobile maintenance expenses, cell phone expenses, GPS expenses, and other job-related expenses, causing Plaintiff's and similarly situated delivery drivers' wages to fall below minimum wage.

16. At all relevant times, Defendants have failed to take reasonable steps to ensure delivery drivers received adequate reimbursement for their automobile and other job-related expenses.

17. All delivery drivers at the Cincinnati Regional Stores, including Plaintiff, are subject to the same employment policies and practices, including policies and practices with respect to wages and out-of-pocket expenses.

18. Plaintiff brings this action on behalf of himself and similarly situated current and former delivery drivers who elect to opt in pursuant to FLSA, 29 U.S.C. § 216(b) to remedy violations of the FLSA wage and hour provisions by Defendants.

19. Plaintiff also brings this action on behalf of himself and similarly situated current and former delivery drivers in Ohio, pursuant to Federal Rule of Civil Procedure 23, to remedy violations of Section 34a, the OMFWSA, the Prompt Pay Act, and O.R.C. § 2307.60.

**JURISDICTION AND VENUE**

20. Under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), this Court has jurisdiction over Plaintiff's FLSA claims.

21. Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's Ohio law claims.

22. Venue in this Court is proper under 28 U.S.C. § 1391(b) because the parties reside in this district, and a substantial part of the events giving rise to the claim herein occurred in this district.

**PARTIES**

**Plaintiff**

**Paul Mullins**

23.     Plaintiff Paul Mullins is a citizen of the United States and resides in the Southern District of Ohio.  Further, at all times material herein Plaintiff worked within the boundaries of Southern District of Ohio.

24.     At all times relevant herein, Plaintiff was an "employee" of Defendants as defined in the FLSA, the OMFWSA, and Section 34a.

25.     Plaintiff has given written consent to join this action, a copy of which is attached to this Class Action Complaint.

**<u>Defendants</u>**

26.     Defendants have jointly employed Plaintiff and similarly situated delivery drivers at all times relevant.

27.     Each of the Defendants had substantial control over Plaintiff and similarly situated delivery drivers' working conditions, and over the unlawful policies and practices alleged herein.

28.     Defendants are part of a single integrated enterprise.

29.     At all relevant times, the Cincinnati Regional Stores shared common management and were centrally controlled and/or owned by all Defendants.

30.     At all relevant times, all Defendants maintained control over labor relations at the Cincinnati Regional Stores.

31.     During all relevant times, Defendants permitted employees to transfer or be shared by and between the Cincinnati Regional Stores without retraining.

32.     Defendants share or co-determine those matters governing the essential terms and conditions of employment for Plaintiff and similarly situated delivery drivers at the Cincinnati Regional Stores.

33.     Defendants suffer or permit Plaintiff and other delivery drivers to work.

34.     Defendants have direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated delivery drivers.

35.     Domino's possesses the authority to control employees' terms and conditions of employment at the Cincinnati Regional Stores, and also exercises that authority.

36.     During all relevant times, Defendants exercised operational control over the delivery drivers at the Cincinnati Regional Stores, including, but not limited to, control over recruiting and training of delivery drivers, compensation of delivery drivers, job duties of delivery drivers, reimbursements to delivery drivers, recruiting and training of managers, design and layout of the Cincinnati Regional Stores, sales and marketing programs, public relations programs, promotional services, appearance and conduct standards, and inventory controls.

**Domino's Pizza, Inc.**

37.     Defendant Domino's Pizza, Inc. is a foreign corporation organized under the laws of the state of Delaware, with its principal place of business in Michigan.

38.     Domino's Pizza, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

39.     Upon information and belief, Domino's Pizza, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all

of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

40.     At all relevant times, Domino's Pizza, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

41.     At all relevant times, Domino's Pizza, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

42.     Domino's Pizza, Inc.'s gross revenue exceeds $500,000 per year.

**Domino's Pizza, LLC**

43.     Defendant Domino's Pizza, LLC is a foreign limited liability company organized under the laws of the state of Michigan and doing business as "Domino's Pizza" in the Southern District of Ohio.

44.     Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

45.     Domino's Pizza, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

46.     Upon information and belief, Domino's Pizza, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

7

47.     At all relevant times, Domino's Pizza, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

48.     At all relevant times, Domino's Pizza, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

49.     Domino's Pizza, LLC's gross revenue exceeds $500,000 per year.

**Domino's Pizza Franchising, LLC**

50.     Defendant Domino's Pizza Franchising, LLC is a foreign limited liability company organized under the laws of the state of Delaware, with its principal place of business in Michigan. Domino's Pizza Franchising, LLC does business as "Domino's Pizza" in the Southern District of Ohio.

51.     Domino's Pizza Franchising, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

52.     Domino's Pizza Franchising, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

53.     Upon information and belief, Domino's Pizza Franchising, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

54.     At all relevant times, Domino's Pizza Franchising, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

55.     At all relevant times, Domino's Pizza Franchising, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

56.     Domino's Pizza Franchising, LLC's gross revenue exceeds $500,000 per year.

**Southern Ohio Pizza, Inc.**

57.     Defendant Southern Ohio Pizza, Inc. is a domestic corporation doing business as "Domino's Pizza" in the Southern District of Ohio.

58.     SOP was incorporated on February 8, 1980 by Louis Metro.

59.     "Southern Ohio Pizza, Inc." is the corporate entity that appears on Plaintiff's paystubs for work completed for Defendants.

60.     SOP is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

61.     SOP owns and operates Domino's Pizza restaurants at each of the following locations, and possibly others (the "Cincinnati Regional Stores"):

    a.   3517 Roosevelt Blvd., Middletown, OH 45044

    b.   4 East State Street, Trenton, OH 45067

    c.   311 Reading Road, Mason, OH 45040

    d.   975 Symmes Road, Fairfield, OH 45014

    e.   7971 Cincinnati-Dayton Road, West Chester, OH 45069

9

f. 5765 S.R. 48, Suite 106, Maineville, OH 45039

g. 1440 Haldimand Ave., Hamilton, OH 45013

h. 1103 W. Eads Parkway, Lawrenceburg, IN 47025

i. 100 N. Main Street, Monroe, OH 45050

j. 908 South Erie Hwy., Hamilton, OH 45011

k. 4182 Tonya Trail, Hamilton, OH 45011

l. 1126 St. Rt. 131, Milford, OH 45150

m. 606 N. University Blvd., Middletown, OH 45042

n. 6411 Branch Hill Guinea Pike, Loveland, OH 45140

o. 1008 E. Second Street, Franklin, OH 45005

p. 205 N. Main Street, Springboro, OH 45066

q. 6780 Goshen Road, Goshen, OH 45122

r. 9582 Cincinnati-Columbus Road, Cincinnati, OH 45241

s. 3915 Montgomery Road, Loveland, OH 45140

62. Upon information and belief, SOP applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

63. At all relevant times, SOP maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

64.     At all relevant times, SOP has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

65.     SOP's gross revenue exceeds $500,000 per year.

**Louis Metro**

66.     Defendant Louis Metro is one of two Franchise Owners of the Cincinnati Regional Stores, along with his wife Karen.

67.     Upon information and belief, Louis Metro resides in Springboro, Ohio.

68.     At all relevant times, Louis Metro has been an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

69.     At all relevant times, Louis Metro has been actively involved in managing the operations of the Cincinnati Regional Stores.

70.     At all relevant times, Louis Metro had control over Defendants' pay policies and the unlawful policies and practices alleged herein.

71.     At all relevant times, Louis Metro had power over personnel and payroll decisions at the Cincinnati Regional Stores.

72.     At all relevant times, Louis Metro had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

73.     At all times relevant, Louis Metro had the power to transfer the assets and liabilities of SOP.

74.     At all relevant times, Louis Metro had the power to declare bankruptcy on behalf of SOP.

75.     At all relevant times, Louis Metro had the power to enter into contracts on behalf of SOP.

76.     At all relevant times, Louis Metro had the power to close, shut down, and/or sell SOP.

**Karen Metro**

77.     Defendant Karen Metro is one of two Franchise Owners of the Cincinnati Regional Stores, along with her husband Louis.

78.     Upon information and belief, Karen Metro resides in Springboro, Ohio.

79.     At all relevant times, Karen Metro has been an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA, the OMFWSA, and Section 34a.

80.     At all relevant times, Karen Metro has been actively involved in managing the operations of the Cincinnati Regional Stores.

81.     At all relevant times, Karen Metro had control over Defendants' pay policies and the unlawful policies and practices alleged herein.

82.     At all relevant times, Karen Metro had power over personnel and payroll decisions at the Cincinnati Regional Stores.

83.     At all relevant times, Karen Metro had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

84.     At all times relevant, Karen Metro had the power to transfer the assets and liabilities of SOP.

85.     At all relevant times, Karen Metro had the power to declare bankruptcy on behalf of SOP.

86.     At all relevant times, Karen Metro had the power to enter into contracts on behalf of SOP.

87.     At all relevant times, Karen Metro had the power to close, shut down, and/or sell SOP.

## FACTS

### CLASSWIDE FACTUAL ALLEGATIONS

88.     During all relevant times, Defendants have operated the Cincinnati Regional Stores, approximately nineteen Domino's Pizza locations in the Cincinnati, Ohio area.

89.     The primary function of the Cincinnati Regional Stores is to sell pizza and other food items to customers, whether they carry out or have their food delivered.

90.     Each of the Cincinnati Regional Stores employs delivery drivers who are primarily responsible for delivering pizzas and other food items to customers' homes and workplaces.

91.     Plaintiff and the similarly situated persons Plaintiff seeks to represent are current and former delivery drivers employed by Defendants at the Cincinnati Regional Stores.

92.     All delivery drivers employed at the Cincinnati Regional Stores over the last three years have had essentially the same job duties—deliver pizza and other food items to customers.

93.     When there are no deliveries to make, Defendants' delivery drivers are required to work inside the Cincinnati Regional Stores building pizza boxes, cleaning, preparing pizza and other food items, taking orders, and completing other duties inside the restaurant as necessary.

94. Until May 2017, Plaintiff and similarly situated delivery drivers were paid minimum wage minus a tip credit for the hours they spent working inside the Cincinnati Regional Stores.

95. In May 2017, Defendants changed their compensation policy with respect to delivery drivers, and began paying Plaintiff and similarly situated delivery drivers minimum wage while inside the store, and minimum wage minus a tip credit while they were out on the road making deliveries.

96. At all relevant times, Plaintiff and similarly situated delivery drivers have been paid minimum wage minus a tip credit for the hours they spend making deliveries for Defendants.

97. Until May 2017, Defendants did not provide proper notice to Plaintiff and similarly situated delivery drivers of the tip credit rules contained in 29 U.S.C. § 203(m).

98. Plaintiff and similarly situated delivery drivers were required to go through a training session at the beginning of their employment when they watched videos on Domino's PULSE system and took tests regarding Domino's operations. During this time, they were paid minimum wage minus a tip credit.

99. Defendants require delivery drivers to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering Defendants' pizza and other food items.

100. Defendants require delivery drivers to incur and/or pay job-related expenses, including but not limited to automobile costs and depreciation, gasoline expenses, automobile maintenance and parts, insurance, and other equipment necessary for delivery drivers to complete their job duties.

101.    Pursuant to such requirements, Plaintiff and other similarly situated employees purchase gasoline, vehicle parts and fluids, automobile repair and maintenance services, automobile insurance, suffered automobile depreciation, and incurred cell phone and data charges all for the primary benefit of Defendants.

102.    At all relevant times, Plaintiff and other similarly situated delivery drivers were reimbursed a flat per delivery amount.

103.    Until April of 2017, Plaintiff and similarly situated delivery drivers were paid $1.15 per delivery.

104.    Starting April of 2017, the per delivery reimbursement rate was increased at some of Cincinnati Regional Stores. All delivery drivers still receive a flat reimbursement rate per delivery.

105.    At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses or other job-related expenses.

106.    Plaintiff and similarly situated delivery drivers typically average three to six miles per round-trip delivery.

107.    Plaintiff and similarly situated delivery drivers typically make approximately 1-4 deliveries per hour.

108.    According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

      a.     2014: 56 cents/mile
      b.     2015: 57.5 cents/mile
      c.     2016: 54 cents/mile
      d.     2017: 53.5 cents/mile

109.    As a result of the automobile and other job-related expenses incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA and Ohio law.

110.    At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at the Cincinnati Regional Stores.

111.    All of Defendants' delivery drivers had similar experiences to those of Plaintiff. They were subject to the same reimbursement policy; received similar reimbursements; incurred similar automobile expenses; completed deliveries of similar distances and at similar frequencies; and were paid at or near the applicable minimum wage rate before deducting unreimbursed vehicle costs.

112.    Regardless of the precise amount of the per-delivery reimbursement at any given point in time, Defendants' reimbursement formula has resulted in an unreasonable underestimation of delivery drivers' automobile expenses throughout the recovery period, causing systematic violations of the federal minimum wage.

113.    Because Defendants paid their drivers a gross hourly wage at precisely, or at least very close to, the applicable minimum wage, and because the delivery drivers incurred unreimbursed automobile expenses, the delivery drivers "kicked back" to Defendants an amount sufficient to cause minimum wage violations.

114.    While the amount of Defendants' actual reimbursements per delivery may vary somewhat over time, Defendants are relying on the same flawed policy and methodology with respect to all delivery drivers at all of their other Domino's stores. Thus, although reimbursement amounts may differ somewhat by time or region, the amounts of under-

16

reimbursements relative to automobile costs incurred are relatively consistent between time and region.

115.     Defendants have willfully failed to pay federal and Ohio state minimum wage and overtime to Plaintiff and similarly situated delivery drivers at the Cincinnati Regional Stores.

## PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS

116.     Consistent with their policies, patterns, and practices as described herein, Defendants harmed Plaintiff, individually, as follows:

**Paul Mullins**

117.     Plaintiff has worked at Domino's store located at 6411 Branch Hill-Guinea Pike, Loveland, Ohio 45140 since June 2015.

118.     Plaintiff has also covered one shift at Defendants' Domino's store located at 5765 South S.R. 48, Unit 106, Maineville, Ohio 45039.

119.     At both the Branch Hill-Guinea Pike store, and the Maineville store, Plaintiff was subject to the same compensation policies with respect to his job duties, his payrate, and his reimbursement rate. He was not required to retrain before working at the Maineville store.

120.     Plaintiff has worked for Defendants in both a part time and full time capacity over the past two years.

121.     In one or more workweeks, Plaintiff worked over 40 hours per week for Defendants.

122.     As a delivery driver, Plaintiff delivers pizza and other food items to Defendants' customers' homes and businesses.

123. When he is not making deliveries, Plaintiff works inside the restaurant, completing tasks such as taking orders over the phone and in person, checking out carryout customers, cutting pizza, folding pizza boxes, cleaning up around the store, and taking care of other general tasks for the operation of the restaurant.

124. At all times during his employment, Plaintiff has been qualified to perform the essential functions of his job and has performed his duties competently.

125. Throughout Plaintiff's employment, he has been paid minimum wage minus a tip credit for all hours he spent completing deliveries for Defendants. Specifically, he has always been paid $6.00 per hour while completing deliveries.

126. Since May 2017, Defendants has paid Plaintiff minimum wage for all hours worked inside the store.

127. Prior to May 2017, Defendants paid Plaintiff minimum wage minus a tip credit for all hours worked inside the store. Specifically, Defendants paid Plaintiff $6.00 per hour at all times prior to May 2017.

128. Plaintiff's first day of work for Defendants consisted of a half-day training session, where he watched videos on Domino's PULSE system and took tests regarding working at Domino's and Domino's restaurant operations. During this time, he was paid $6.00 per hour.

129. Plaintiff regularly makes approximately two deliveries per hour during the hours he works as a delivery driver.

130. During Plaintiff's employment with Defendants, Defendants failed to adequately reimburse Plaintiff for automobile and other job-related expenses.

131. Until April 2017, Plaintiff was reimbursed $1.15 for each delivery he completed for Defendants.

132. In April 2017, Defendants began reimbursing Plaintiff at $1.47 per delivery.

133. Plaintiff regularly drove between 3 and 6 miles round trip per delivery.

134. Thus, Defendants' average effective reimbursement rate for Plaintiff was approximately $.256 per mile ($1.15 per delivery / 4.5 average miles per delivery).

135. In 2017, for example, the IRS business mileage reimbursement has been $.535 per mile, which reasonably approximated the automobile expenses incurred delivering pizzas. http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates. Using that IRS rate as a reasonable approximation of Plaintiff's automobile expenses, every mile driven on the job decreased his net wages by approximately $.279 ($.535 - $.256) per mile. Considering Plaintiff's estimate of about 4.5 average miles per delivery, Defendants under-reimbursed her about $1.256 per delivery ($.279 x 4.5 average miles).

136. Thus, Plaintiff consistently "kicked back" to Defendants approximately $2.511 per hour ($1.256 per delivery x 2 deliveries per hour).

137. As a result of Defendants' improper taking of the tip credit, and unreimbursed automobile expenses, Defendants have failed to pay Plaintiff minimum wage as required by law.

138. During Plaintiff's employment with Defendants, Defendants failed to adequately reimburse Plaintiff for automobile and other job-related expenses.

139. As a result of unreimbursed automobile expenses and other job-related expenses, Defendants have failed to pay Plaintiff minimum wage as required by law.

**JOINT EMPLOYER ALLEGATIONS**

140. At all relevant times, Defendants jointly employed Plaintiff and similarly situated employees at the Cincinnati Regional Stores.

141. According to Domino's Annual Report for 2016, it is the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

142. In 2016 alone, Domino's grossed $10,000,000,000.00 on delivery sales. The vast majority of the pizzas and other food items Domino's claims to have sold and delivered in 2016 were delivered by delivery drivers in franchise stores, like Plaintiff and his similarly situated delivery drivers at the Cincinnati Regional Stores.

143. According to its own Annual Report, Domino's is "primarily a franchised business."

144. In 2016, ninety-three percent—4,979 out of 5,371—of Domino's restaurants nationwide were owned by franchisees.

145. Further, recent trends show that Domino's is becoming even more franchise dominant. Between 2014 and 2016, Domino's has opened 367 new domestic franchise stores, and 18 new corporate-owned stores.

146. In fiscal year 2016, Domino's earned approximately $312,300,000.00 in sales and profits through franchise stores like the Cincinnati Regional Stores.

147. Conversely, according to Domino's, each franchise store generates an average annual profit of $120,000.00 for itself.

148.     As Domino's explains, their success is about the strength of the brand itself. Domino's believes consumers associate their brand with the timely delivery of quality, affordable food.

149.     However, the vast majority of the individuals who make those timely deliveries are employed in franchise stores, like the Cincinnati Regional Stores.

150.     Domino's exercises substantial control over Plaintiff and similarly situated delivery drivers, both directly and indirectly.

151.     Domino's has the power to curtail the unlawful policies, patterns and/or practices alleged herein, but has refrained from doing so in order to continue to reap the profits from the franchise relationship.

152.     Domino's has a clear and direct interest in franchise stores minimizing labor costs to increase profitability—even if it means minimizing labor costs below state and federal minimums—particularly if they are permitted to collect profits while also being insulated from legal liability.

**Domino's Indirectly Exercises Control Over Delivery Drivers by Controlling Franchisees**

153.     Domino's' Standard Franchise Agreement requires franchisees to adhere to the "Domino's System," which requires stores to "conduct business under a uniform business format, with specially designed equipment, computer hardware and software designated by us, and specifications for the preparation and sale of pizza and certain authorized food products."

154.     Adherence to the Domino's System is required, and failure to comply with Domino's policies and procedures can and does result in a franchise's termination.

155. Through the Domino's System, Domino's controls the actual labor needs of franchise stores, labor budget and allocation for franchise stores, employees' job duties at franchise stores, behavioral policies and procedures at franchise stores, employee training at franchise stores, supply of food, products, and training at franchise stores, advertising and marketing at franchise stores, and the overall operational system and budget of franchise stores, including the Cincinnati Regional Stores.

156. Domino's' 800-page Manager's Guide is a "veritable bible for overseeing a Domino's operation … that literally leaves nothing to chance." *Parker v. Domino's, Inc.*, 629 So. 2d 1026, 1028-29 (Fa. App. 4th Dist. 1993).

157. In addition to the Manager's Guide and hundreds of other operational materials provided by Domino's, franchise stores, including the Cincinnati Regional Stores, are required to purchase, install, and use Domino's' PULSE operating system. PULSE is a comprehensive operating system, used for point-of-sale functions, and for recording employees' worktime using individual employee codes, tracking employee work tasks continuously, recording tips, tracking pizza delivery information, maintaining personnel data, monitoring store hours and product prices, and generating sales, revenue, and payroll reports.

158. PULSE is used in 99% of franchise stores. According to Domino's, PULSE costs between $15,000 and $25,000 per store to purchase and install, and $4,500 per store per year to maintain.

159. Franchise stores, including the Cincinnati Regional Stores, are contractually obligated to provide Domino's full access to their business information, therefore Domino's has

constant, real-time access to all information stored in PULSE in any franchise store nationwide, and reviews certain aspects of that information from all its stores daily.

160.     PULSE tracks, minute-by-minute, all tasks completed after an order is received, and which employee completes each task.

161.     Domino's uses the PULSE system to monitor employee activity.

162.     The PULSE Labor Tools use each store's historical menu mix and sales data to determine what type of employees need to be staffed where, and for how long.  The PULSE system and corporate policy dictates to franchisees exactly how many workers they should have depending on PULSE's precise measurements of workload.

163.     The PULSE Payroll Report is to be used for viewing payroll information, including clock-in and clock-out times, and generating payroll information to give to your accountant or payroll service.

164.     Franchise stores, including the Cincinnati Regional Stores, are required to adhere to Domino's' conditions regarding property leases and the layout and aesthetic of store itself.

165.     Domino's must approve of all franchisee leases.  Leases have to conform with Domino's requirements for its corporate owned locations.

166.     By the end of 2017, all franchise stores, including the Cincinnati Regional Stores, are expected to convert the physical layout of the store to the "Pizza Theater" design created by Domino's corporate.

167.     According to Domino's, the Pizza Theater is designed to minimize costs relating to staffing.

168. Franchise stores, including the Cincinnati Regional Stores, are required to contribute 6% of their retail sales to fund national marketing and advertising campaigns. Domino's Pizza, Inc.'s subsidiary, Domino's National Advertising Fund Inc., has authority over how these funds are spent.

169. Over the past five years, U.S. Domino's stores (93% of which are franchise stores) have invested an estimated $1.5 billion in national, co-operative, and local advertising, according to Domino's' mandate.

170. Domino's SFA requires new franchisees to spend at least $3,000.00 within the first three months on grand opening advertising and promotion.

171. Domino's recently underwent an aggressive advertising campaign where they invited and openly acknowledged negative feedback from consumers. As the 2015 Annual Report states, "without the buy-in from our franchise owners, we couldn't have done it."

172. Domino's requires franchise stores, including the Cincinnati Regional Stores, to offer substantially the same menu items.

173. Domino's has created a "vertically integrated dough manufacturing and supply chain," whereby franchise stores, including the Cincinnati Regional Stores, are required to purchase the ingredients and materials necessary to operate their stores directly from the Domino's Internal Dough Manufacturing and Supply Chain System.

174. In 2016, Domino's generated $1,544,300,000.00 in revenue from its supply chain alone.

175. By monopolizing the supply chain, Domino's allows franchisees even less flexibility in allocating their budget.

176. Domino's digital ordering and marketing platforms have also changed the way employees spend their time while working at franchise stores, including the Cincinnati Regional Stores.

177. In 2010, Domino's decided to develop their own online ordering platform and to manage this important and growing area of their business internally.

178. Franchise stores, including the Cincinnati Regional Stores, are required to accept orders over Domino's digital platforms, and are not permitted to opt out of Domino's digital ordering platforms.

179. In 2016, more than half of all sales in the United States (including both corporate owned and franchise stores) were ordered digitally through Domino's' fifteen proprietary digital ordering platforms.

180. Domino's' digital ordering platforms directly influence the terms and conditions of employment at Domino's franchise stores. With over fifty percent of orders being placed online without the assistance of an in-store employee, franchise employees' job duties and time at work can and have been re-allocated to other tasks.

181. In addition to requiring franchisees to pay them for advertising fees, pay them for the PULSE operating system, and pay them for the food and material needed to make Domino's' products, Domino's requires franchise stores to pay to pay 5.5% of royalty sales to Domino's.

182. Domino's sets employee standards, and enforces those standards through constant communications with franchisees and in-person inspections throughout the year.

183. Domino's goes beyond the supervision of food quality, instead engaging in co-supervision or co-management of everyday store operations and employee activities.

184.   Domino's typically requires prospective franchisees to manage a Domino's location for at least one year prior to entering into the franchise agreement, because this enables Domino's to observe the operational and financial performance of a potential franchisee prior to entering into a long-term contract.

185.   Domino's Franchise Operations personnel provide guidance and supervision to franchise employees through on-site visits and instructions.

186.   In order to deviate from the Manager's Guide, franchisees must apply to Domino's for a "variance," which are rarely granted.

187.   Domino's is in constant communication with franchisees regarding operations, promotions, sales, and any other matters that arise in the store.

188.   Domino's maintains a productive relationship with their independent franchise owners through regional franchise teams, distributing materials that help franchise stores comply with Domino's standards and using franchise advisory groups that facilitate communications between Domino's and their franchisees.

189.   According to Domino's, at least three times per year, Domino's conducts site inspections of franchise stores, called Operations Evaluations Reports.  A Domino's Evaluation inspector makes an unannounced visit to each store, assessing every aspect of store operations, and awarding it a score from 0 to 100 for compliance with Domino's standards.

190.   Franchise stores who receive low Evaluation scores are given a Notice of Default, and required to submit an action plan to Domino's Area Leaders.  If a franchisee receives three Notices of Default in one year, the franchise can be terminated even if the defaults were corrected.

191. In addition to Evaluations, Area Leaders regularly make unannounced visits to franchise stores.

192. Domino's has the power to terminate franchise agreements based on "failure to adhere to specified Company policies and standards." Upon information and belief, those specified policies and standards include failure to operate the store in full compliance with applicable wage-and-hour laws, or to engage in conduct that adversely affects the Domino's brand and the goodwill of Domino's trademarks. Therefore, Domino's is ultimately able to control how its franchisees operate, and could have terminated SOP's franchise agreements due to their systematic failure to obey federal and state labor laws.

193. By mandating the franchise stores operate on a shoestring budget according to their own detailed policies and guidelines, Domino's controls the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers.

**Domino's Directly Controls Delivery Drivers**

194. Domino's exercises substantial direct control over Plaintiff and similarly situated delivery drivers at the Cincinnati Regional Stores.

195. Domino's exercises control over hiring at franchise stores, including the Cincinnati Regional Stores.

196. Delivery driver job positions for the Cincinnati Regional Stores are posted on the Domino's corporate website, www.dominos.com, and contain similar language to the delivery driver position postings for Domino's corporate stores. The job posting identifies specific job duties and minimum requirements for the job, which are nearly identical across all Domino's stores.

197. Domino's mandates that applicants undergo a background check before they can be hired at franchise stores, including the Cincinnati Regional Stores.

198. Domino's requires background checks upon hire and at every third anniversary for employees in both corporate and franchise stores.

199. Domino's requires these background checks to be conducted by one of four pre-determined background check agencies, and themselves mandate the process and criteria for a passable background check, with no input from franchisees.

200. Domino's background check agencies provide franchisees, including the Cincinnati Regional Stores, with a "meets/does not meet" answer for each job applicant, precluding franchisees from considering individual circumstances, or setting the criteria for employment in the first place.

201. If an applicant meets Domino's criteria and makes it through the door at a franchise store, their job performance is thereafter measured by reference to standards and metrics laid out by Domino's.

202. Domino's creates, designs, builds and updates all training and development programs for its franchisees and employees.

203. Domino's states that franchisees are free to create their own training programs, but any training program must contain certain minimum content comparable to that found in the Delivery Safety & Security courses and the following courses from High Performance University Core Operations Training – The Basics: 1. New Team Member Orientation – History & Culture, 2. New Team Member Orientation – Basic Standards, 3. Safety, 4. Robbery Prevention, 5. Cleaning and Sanitation.

204.     The distances travelled by Plaintiff and similarly situated delivery drivers per delivery is directly decreed by Domino's.

205.     Domino's Standard Franchise Agreement ("SFA") assigns an exclusive area of primary responsibility to each franchised store.  Said differently, Domino's determines the delivery radius for each store.

206.     Pursuant to the SFA, franchise stores are not permitted to modify their delivery radius without seeking approval from Domino's.

207.     Domino's SFA provides that Domino's will proscribe procedures and standards under which franchisees are to determine, on an annual basis, whether certain delivery areas might present a danger to employees.

208.     Domino's exercises significant control over the scheduling and workload of franchise employees, including employees at the Cincinnati Regional Stores.

209.     Section 12 of the Manager's Guide sets mandatory minimum scheduling and staffing rules for all franchise stores which play a significant role in determining scheduling of those stores' employees.

210.     Domino's corporate employees provide franchisees with instructions on how to schedule, including, *e.g.*, to adjust schedules based on PULSE reports regarding delivery times, to "cross train" drivers on in-store tasks to make it possible to schedule more drivers and fewer in-store employees, to schedule enough delivery drivers to eliminate "triples," or deliveries of three different orders during a single delivery run, and to schedule employees in regular 15-minute increments.  These types of directives have a direct impact on the employment of Plaintiff and similarly situated delivery drivers.

211.    By eliminating "triples," for example, Domino's restricts Plaintiff and other delivery drivers' income because they drive longer distances and times to collect the same tips and per delivery reimbursement payments.

212.    Company policy dictates that delivery drivers complete their deliveries within 30 minutes of the order being placed.  Franchise stores, including the Cincinnati Regional Stores, are critiqued based on whether orders were delivered "on-time."

213.    Section 12 of the Manager's Guide standards directly impacts franchisee employees' compensation by prohibiting tip jars in franchise stores.

214.    Domino's has strict and specific requirements about employee appearance, requiring that employees shave daily, specifying the permitted hair length, restricting piercings and earrings, tattoos, sock and undershirt colors, and uniforms to be worn by employees at franchise stores, including the Cincinnati Regional Stores.

215.    The Manager's Guide mandates that delivery drivers, including those at franchise stores, may not carry more than $20 with them during deliveries.  Domino's has used this policy to place a franchisee in "default."

216.    Domino's also exercises control over discipline and termination decisions. Domino's reserves the right to terminate a franchise if they refuse to comply with Domino's' directives to terminate or discipline an employee.

217.    Domino's promotes an anti-union policy to its franchisees, and takes active steps from preventing franchisee employees from creating a union.

218.    Specifically, Domino's distributes their own internal union avoidance materials to franchisees, and its HR Director and legal team advise franchisees on how to prevent union

activity. Domino's own head of Human Resources and outside labor counsel have met and consulted with franchise owners regarding potential union activity.

219. In response to some union activity, Domino's distributed materials stating that "There is no union at Domino's, and the company does not want a union here. We will do everything legally possible to keep a union out."

220. By restricting or attempting to restrict employees' ability to unionize, Domino's is exercising direct control over franchisee employees.

221. Domino's is directly involved in customer and employee complaints at franchise stores, including the Cincinnati Regional Stores. Domino's Customer Care Center allows customers and employees to complain directly to Domino's. Domino's then allows the franchisee five days to remedy the situation, while evaluating the timing and adequacy of the response.

222. Domino's maintains employment records for franchise stores. PULSE contains employees' clock in/out information, first and last names, descriptions and times spent on various job tasks and other timekeeping data for employees, wage rates, tips reported by drivers, and mileage calculations that could be used to reimburse delivery drivers for delivery expenses. Domino's has total access to this data, and accesses it daily.

**Domino's Ignored and Profited from the Wage Violations**

223. Domino's franchise model has been heavily scrutinized for decades.

224. Most recently, on May 23, 2016, the Attorney General of the State of New York accused Domino's of many of the same wage violations Plaintiff alleges herein, and also fraud relating to Domino's failure to inform its franchisees of wage-related "defects" in the PULSE

system. *Petition, People v. Domino's Inc., et al.* (Sup. Ct. New York County May 23, 2016) (No. 450627-2016).

225. Domino's has meticulously reviewed and monitored its PULSE systems, and all of its programs and materials for use in its stores. On a semi-annual basis, Domino's notifies franchisees of various changes and adjustments that have been made to the PULSE system.

226. Domino's has notified franchisees of hundreds of issues and/or improvements to PULSE over the years, however they have been noticeably silent when a PULSE "defect" results in low-level employees, such as delivery drivers, to be underpaid.

227. For example, Domino's has been aware since 2007 that the PULSE system does not permit entry of more than one wage rate for the same employee, resulting in delivery employees impermissibly being subjected to the tip credit, including at the Cincinnati Regional Stores. Also, since 2007, Domino's has been aware that PULSE calculates tip credit overtime wages at the wrong rate.

228. However, despite knowledge of the wage and hour issues created by using PULSE for payroll since 2007, Domino's did nothing to notify franchisees of any problems until May 2015, when they inserted a two-sentence advisement to franchisees tucked within the 800-page Manager's Guide that PULSE was not meant to be a payroll system.

229. At the same time that Domino's was withholding these PULSE "defects" from its franchisees, Domino's corporate stores had adopted a different software program, PeopleSoft, which contained all of the necessary functions for properly calculating employees' payroll.

230. Just as Domino's' supply chain is "vertically integrated," so too are the labor policies that relate to Plaintiff and similarly situated delivery drivers.

231. Domino's has been aware and/or should have been aware of the wage and hour violations alleged herein, and has at all times had the authority to stop them from happening.

232. Along with the other Defendants, Domino's jointly employed Plaintiff and similarly situated delivery drivers at the Cincinnati Regional Stores.

## COLLECTIVE ACTION ALLEGATIONS

233. Plaintiff brings the First and Second Counts on behalf of himself and all similarly situated current and former delivery drivers employed at the Cincinnati Regional Stores owned, operated, and controlled by Defendants nationwide, during the three years prior to the filing of this Class Action Complaint and the date of final judgment in this matter, who elect to opt-in to this action (the "FLSA Collective").

234. At all relevant times, Plaintiff and the FLSA Collective have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of willfully refusing to pay Plaintiff and the FLSA Collective minimum wage for all hours worked, time-and-one-half overtime pay for hours worked in excess of 40 per workweek, and failing to reimburse delivery drivers for automobile expenses and other job-related expenses. Plaintiff's claims are essentially the same as those of the FLSA Collective.

235. Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by failing to properly pay Plaintiff and the FLSA Collective.

236. Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for all hours worked.

237.     Defendants are aware or should have been aware that federal law required them to reimburse delivery workers for expenses relating to "tools of the trade," such as, among other things, automobile costs and gasoline for delivery drivers.

238.     Defendants are aware or should have been aware that federal law required them to pay non-exempt employees an overtime premium for hours worked over 40 per workweek.

239.     Defendants' unlawful conduct has been widespread, repeated, and consistent.

240.     The First and Second Counts are properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

241.     The FLSA Collective members are readily identifiable and ascertainable.

242.     For the purpose of notice and other purposes related to this action, the FLSA Collective members' names and addresses are readily available from Defendants' records.

243.     In recognition of the services Plaintiff has rendered and will continue to render to the FLSA Collective, Plaintiff will request payment of a service award upon resolution of this action.

## CLASS ACTION ALLEGATIONS

244.     Plaintiff brings the Third, Fourth, Fifth, and Sixth Counts under Federal Rule of Civil Procedure 23, on behalf of themselves and a class of persons consisting of:

> All current and former delivery drivers employed by Defendants in the State of Ohio between June 23, 2014 and the date of final judgment in this matter ("Rule 23 Class").

245.     Excluded from the Rule 23 Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned

and any member of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

246.    The number and identity of the Rule 23 Class members are ascertainable from Defendants' records.  The hours assigned and worked, the positions held, and the rates of pay and reimbursement for each Rule 23 Class Member are also determinable from Defendants' records.  For the purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendants.  Notice can be provided by means permissible under Federal Rule of Civil Procedure 23.

247.    The Rule 23 Class member are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

248.    There are more than 50 Rule 23 Class members.

249.    Plaintiff's claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

250.    Plaintiff and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to pay overtime, and failing to reimburse for expenses.

251.    Plaintiff and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with OMFWSA, Section 34a, and O.R.C. § 4113.15.

252.    Plaintiff and the Rule 23 Class members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and

patterns of conduct. Defendants' corporate-wide policies and practices affected all Rule 23 Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

253.     Plaintiff and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

254.     By seeking to represent the interests of the Rule 23 Class members, Plaintiff is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

255.     Plaintiff is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

256.     Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

257.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them. On the

other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs. The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

258.　Upon information and belief, Defendants and other employers throughout the state violate the OMFWSA, Section 34a, and O.R.C. § 4113.15. Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

259.　This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

260.　Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Plaintiff and the Rule 23 Class members individually and include, but are not limited to:

a. Whether Defendants paid Plaintiff and the Rule 23 Class members at the proper minimum wage rate for all hours worked;

b. Whether Defendants failed to reimburse automobile expenses, gasoline expenses, and other job-related expenses, as described herein, causing Plaintiff and the Rule 23 Class members' wages to drop below legally allowable minimum wage and overtime;

c. Whether Defendants provided proper notice of the tip credit to Plaintiff and the Rule 23 Class as required by 29 U.S.C. § 203(m);

d. Whether Plaintiff and the Rule 23 Class spent more than 20% of their time at work in a non-tipped capacity;

e. Whether Defendants properly compensated Plaintiff and the Rule 23 Class for hours worked in excess of 40 each workweek;

f. Whether Defendants failed to pay Plaintiff and the Rule 23 Class in a timely manner as described by O.R.C. § 4113.15;

g. Whether Defendants' policy of failing to pay Plaintiff and the Rule 23 Class was instituted willfully or with reckless disregard of the law; and

h. The nature and extent of class-wide injury and the measure of damages for those injuries.

261.    In recognition of the services Plaintiff has rendered and will continue to render to the Rule 23 Class, Plaintiff will request payment of a service award upon resolution of this action.

## CAUSES OF ACTION

### Count 1
### Failure to Pay Minimum Wages - Fair Labor Standards Act
### (On Behalf of Plaintiff and the FLSA Collective)

262.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

38

263.     Plaintiff and the FLSA Collective are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

264.     Defendants impermissibly took a tip credit from the wages of Plaintiff and the FLSA Collective.

265.     Upon information and belief, Defendants did not provide Plaintiff and the FLSA Collective with notice of the tip credit rules as required by 29 U.S.C. § 203(m) until May 2017.

266.     Defendants paid Plaintiff and the FLSA Class minimum wage minus a tip credit for all hours worked, including hours worked inside the restaurant in a non-tipped capacity, until May 2017.

267.     Defendants required and continue to require Plaintiff and the FLSA Collective to pay for automobile expenses and other job-related expenses out of pocket, failed to reasonably calculate the value of said expenses, and failed to adequately reimburse Plaintiff and the FLSA Collective for said expenses.

268.     By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiff and the FLSA Collective.

269.     Plaintiff and the FLSA Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

270.     As a result of Defendants' violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

**Count 2**
**Failure to Pay Overtime Wages – Fair Labor Standards Act**
**(On Behalf of Plaintiff and the FLSA Collective)**

271. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

272. Plaintiff and the FLSA Collective worked more than forty hours in one or more workweeks.

273. Because Defendants impermissibly took a tip credit from the wages of Plaintiff and the FLSA Collective, and required Plaintiff and the FLSA Collective to pay for automobile expenses and other job-related expenses out of pocket, Defendants did not pay Plaintiff and the FLSA Collective at least one and a half times their normal hourly rate for time worked in excess of forty hours per workweek.

274. By not paying Plaintiff and the FLSA Collective proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have willfully violated the FLSA.

275. As a result of Defendants' willful violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

### Count 3
### Failure to Pay Minimum Wages - Ohio Constitution, Article II, § 34a
### (On Behalf of Plaintiff and the Rule 23 Class)

276. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

277. Defendants paid Plaintiff and the Rule 23 Class below minimum wage for the hours they worked by requiring them to cover automobile expenses and other job-related expenses.

40

278.    Defendants paid Plaintiff and the Rule 23 Class at minimum wage minus a tip credit for hours worked in a non-tipped capacity.

279.    Article II § 34a of the Ohio Constitution requires that employees be paid not less than minimum wage as determined by an inflation index for all hours worked.

280.    Because Defendants required Plaintiff and the Rule 23 Class to pay for automobile expenses and other job-related expenses out of pocket, Defendants failed pay Plaintiff and the Rule 23 Class minimum wage.

281.    By not paying Plaintiff and the Rule 23 Class at least minimum wage for each hour worked, including hours worked in a non-tipped capacity, Defendants have violated the Ohio Constitution, Article II, § 34a.

282.    As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, an additional two times unpaid wages/unreimbursed expenses in damages under Section 34a, costs, and attorneys' fees.

## Count 4
### Failure to Pay Overtime Wages – Ohio Minimum Fair Wage Standards Act
### (On Behalf of Plaintiff and the Rule 23 Class)

283.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

284.    Plaintiff and the Rule 23 Class worked more than forty hours in one or more workweeks.

285.    Because Defendants impermissibly took a tip credit from the wages of Plaintiff and the Rule 23 Class, and because Defendants required Plaintiff and the Rule 23 Class to pay for

automobile expenses and other job-related expenses out of pocket, Defendants did not pay Plaintiff and the Rule 23 Class at least one and a half times their normal hourly rate for time worked in excess of forty hours per workweek.

286.    By not paying Plaintiff and the Rule 23 Class proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have violated the OMFWSA.

287.    As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid overtime wages, unreimbursed expenses, costs, and attorneys' fees.

<u>**Count 5**</u>
**Untimely Payment of Wages – O.R.C. § 4113.15**
**(On Behalf of Plaintiff and the Rule 23 Class)**

288.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

289.    During all relevant times, Defendants were entities covered by O.R.C. § 4113.15, and Plaintiff and the Rule 23 Class were employees within the meaning of O.R.C. § 4113.15 and were not exempt from its protections.

290.    O.R.C. § 4113.15(A) requires that Defendants pay Plaintiff and the Rule 23 Class all wages, including unpaid overtime, on or before the first day of each month, for wages earned during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned during the last half of the preceding calendar month.

291.    Plaintiff and the Rule 23 Class's unpaid wages and unreimbursed expenses have remained unpaid for more than thirty (30) days beyond their regularly scheduled payday.

292.     In violating Ohio law, Defendants acted willfully, without a good faith basis and with reckless disregard to Ohio law.

293.     As a result of Defendants' willful violation, Plaintiff and the Rule 23 Class are entitled to unpaid wages and liquidated damages, as stated in O.R.C. § 4113.15.

## Count 6
### Damages Pursuant to O.R.C. § 2307.60
### (On Behalf of Plaintiff and the Rule 23 Class)

294.     Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

295.     The Fair Labor Standards Act, 29 U.S.C. § 216(a), imposes criminal penalties for willful violations of the FLSA.

296.     By their acts and omissions described herein, Defendants have willfully violated the FLSA, and Plaintiff and the Rule 23 Class have been injured as a result.

297.     O.R.C. § 2307.60 permits anyone injured in person or property by a criminal act to recover damages in a civil action, including exemplary and punitive damages.

298.     As a result of Defendants' willful violations of the FLSA, Plaintiff and the Rule 23 Class are entitled to compensatory and punitive damages pursuant to O.R.C. § 2307.60.

**WHEREFORE**, Plaintiff Paul Mullins prays for all of the following relief:

A.     Designation of this action as a collective action on behalf of the collective action members and prompt issuance of notice to all similarly-situated members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and their counsel to represent the collective action members.

B.      Unpaid minimum wages, overtime pay, reimbursement of expenses, and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.      Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.      Designation of Plaintiff as representative of the Rule 23 Class and counsel of record as Class Counsel;

E.      A declaratory judgment that the practices complained of herein are unlawful under Section 34a, the OMFWSA, and O.R.C. § 4113.15.

F.      An award of unpaid minimum wages, overtime wages, and unreimbursed expenses due under Section 34a and the OMFWSA.

G.      An award of damages under Section 34a, based on Defendants' failure to pay minimum wages pursuant to Section 34a, calculated as an additional two times of back wages.

H.      Liquidated damages under O.R.C. § 4113.15.

I.      Compensatory and punitive damages under O.R.C. § 2307.60.

J.      An award of prejudgment and post-judgment interest.

K.      An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees.

L.      Such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

  /s/ Andrew Kimble
Andrew Biller (0081452) (Lead Counsel)
Andrew Kimble (0093172)
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

*Counsel for Plaintiffs and the putative class*

## JURY DEMAND

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

  /s/ Andrew Kimble
Andrew Kimble